United States Court of Appeals
Fifth Circuit

**F I L E D**

January 24, 2007

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS
For the Fifth Circuit

No. 04-31026

LORETTO O'REILLY, JR., ET AL.,

Plaintiffs-Appellees,

VERSUS

UNITED STATES ARMY CORPS OF ENGINEERS

Defendant-Appellant,

ERIC A. BOPP

Intervenor-Appellant

Appeals from the United States District Court
for the Eastern District of Louisiana

Before DAVIS and DENNIS, Circuit Judges.[*]

DENNIS, Circuit Judge:

Plaintiffs, residents of St. Tammany Parish, Louisiana, who allege that the environment surrounding their dwellings, businesses, and recreational areas will be unlawfully harmed by a residential subdivision developer's dredging and filling of wetlands, challenge the United States Army Corps of Engineers'

---

[*] Smith, Circuit Judge, originally on the panel, recused after oral argument. The case is being decided by a quorum. 28 U.S.C. § 46(d).

1

("the Corps") Finding Of No Significant Impact ("FONSI") on the environment under the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321-4370f, which resulted in the Corps's issuance of a permit to dredge and fill wetlands to the developer under § 404 of the Clean Water Act, 33 U.S.C. § 1344. Plaintiffs contend that the Corps acted arbitrarily in issuing the FONSI for the dredge and fill permit because its Environmental Assessment (EA), the basis for the FONSI, (1) does not articulate a rational basis for finding that the mitigation measures imposed by the Corps upon the dredging and filling operations reduce their harmful effects below the level of significant environmental impacts; (2) does not adequately consider the project's cumulative effects; and (3) improperly segments the project by considering only the first of three possible phases of development. Consequently, plaintiffs argue, NEPA required that the Corps prepare a full-fledged environmental impact statement ("EIS") before issuing permits affecting the wetlands.

The district court agreed with plaintiffs and held that the Corps had acted arbitrarily in violation of NEPA because it failed to: (1) articulate or demonstrate how the mitigation measures will succeed; (2) consider the cumulative effects of the project, the permits to third parties, and the growing area urbanization; (3) consider the effects of the current proposal together with the effects of additional phases of the developer's long range

2

residential subdivision plans.

We agree with the district court that the Corps acted arbitrarily in issuing a FONSI based on an EA that fails to articulate how the mitigation measures will render the adverse effects insignificant and to consider the cumulative effects of the project, area urbanization, and permits issued to third parties. But we disagree with the district court's conclusion that the Corps engaged in improper segmentation of the project by failing to include full analysis of two possible future phases of development in its EA. Accordingly, we affirm the district court's holding that the Corps acted arbitrarily in the foregoing respects, but we amend the district court's injunction, reverse the balance of its decision, and remand the case to the Corps for further proceedings consistent with this opinion.

I. The NEPA Framework

Before we begin our analysis, we review NEPA's framework, terminology and objectives. "NEPA . . . was intended to reduce or eliminate environmental damage and to promote 'the understanding of the ecological systems and natural resources important to' the United States." Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 756 (2004) (quoting 42 U.S.C. § 4321). Instead of mandating particular

3

environmental results, NEPA "imposes procedural requirements on federal agencies, requiring agencies to analyze the environmental impact of their proposals and actions." Coliseum Square Ass'n, Inc. v. Jackson, 465 F.3d 215, 224 (5th Cir. 2006) (quoting Pub. Citizen, 541 U.S. at 756-57). NEPA's central requirement is that federal agencies must, except in certain qualifying situations, complete a detailed environmental impact statement ("EIS") for any major federal action significantly affecting the quality of the human environment. 42 U.S.C. § 4332(2). To assist these agencies in determining whether an EIS must be prepared, NEPA authorized the Council on Environmental Quality ("CEQ") to promulgate guidelines in the form of regulations. See 40 C.F.R. § 1500.3; see also Coliseum Square, 465 F.3d at 224.

NEPA requires an agency to produce a full EIS only where the agency proposes to undertake a project that qualifies as a "major Federal action[]," and then only when that action "significantly affect[s] the quality of the human environment." 42 U.S.C. § 4332(2)(C); see also Coliseum Square, 465 F.3d at 228. The CEQ regulations define a "[m]ajor Federal action" as "actions with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18; see also Coliseum Square, 465 F.3d at 228. Effects, for the purposes of the regulations, "include: (a) [d]irect effects, which are caused by the action and occur at the same time and place," and "(b)

4

[i]ndirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8; see also Coliseum Square, 465 F.3d at 228.

"The CEQ regulations allow an agency to prepare a more limited document, an Environmental Assessment (EA), if the agency's proposed action neither is categorically excluded from the requirement to produce an EIS nor would clearly require the production of an EIS." Pub. Citizen, 541 U.S. at 757 (citing 40 C.F.R. §§ 1501.4(a),(b)). An EA should be a "concise public document . . . that serves to . . . [b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS]." 40 C.F.R. § 1508.9(a). In some cases, an agency may find that it must complete a full EIS. Where an EA results in a determination that an EIS is not required, however, the agency must issue a Finding of No Significant Impact ("FONSI"). Coliseum Square, 465 F.3d at 224 (quoting Pub. Citizen, 541 U.S. at 757). The FONSI must briefly state "the reasons why the proposed agency action will not have a significant impact on the human environment." Coliseum Square, 465 F.3d at 224 (citing 40 C.F.R. §§ 1501.4(e), 1508.13).

II. Factual and Procedural Background

A. Agency Proceedings

The Planche family plans to develop its plot of land in St.

Tammany Parish, near Covington, Louisiana, as a residential subdivision. The plot includes wooded wetlands bordering Timber Creek, which flows through the property to Timber Branch, a tributary of the Tchefunte River. The subdivision development will require dredging and filling of wetlands and the discharge of materials into navigable waters. The Clean Water Act requires that the developer obtain a § 404 permit from the Corps before such discharge and that the Corps comply with NEPA in issuing the permit.[1]

In 1999, a representative of the Planche family filed an initial permit for a three-phase project that covered 147.13 total acres including 91.94 acres of wetlands. In September of that same year, the Corps and the Louisiana Department of Environmental Quality jointly posted public notice of the proposed project and

---

[1] Section 404 of the Clean Water Act governs discharge of dredged or fill materials into navigable waters. Permit applicants must design their project to avoid adverse wetlands impacts where "practicable" and to minimize those impacts to an extent "appropriate and practicable." "Memorandum of Agreement between the Department of the Army and the Environmental Protection Agency Concerning Determination of Mitigation under the Clean Water Act section 404(b)(1)", 20 ENVTL. L. REP. 35,223 (Feb. 6, 1990). In evaluating a permit request, the Corps must comply not only with the requirements of the Clean Water Act, but also with NEPA's procedural requirements. See Sierra Club v. Sigler, 695 F.2d 957, 967 (5th Cir. 1983) (holding that the decision as to whether or not to issue a § 404 permit must be reviewed under NEPA). It is NEPA that concerns us here: the parties do not argue that the permit violated the Clean Water Act; rather the debate is over whether the Corps failed to meet the procedural requirements imposed upon it under NEPA.

its permit application.[2] As a result of that notice, the Corps received public comments, including objections from the United States Environmental Protection Agency. Eventually, the applicant withdrew the initial permit application.

In September 2000, a different representative of the Planche family, August J. Hand, submitted a revised permit application. The new application sought a § 404 permit only for Phase I of the project, covering 81.58 total acres, including 39.54 acres of wetlands. The Corps again posted public notice and accepted comments. The Corps also began NEPA review of the project and determined that, in light of the mitigation measures mandated by the permit conditions required by the Clean Water Act, as well as other state and local laws,[3] the requested permit would have no significant impact on the environment.

Accordingly, on November 18, 2003, the Corps issued a "mitigated FONSI" - a Finding of No Significant Impact concluding that the project's adverse impacts would be reduced to a less-than-significant level via mitigation conditions attached to the permit. See Spiller v. White, 352 F.3d 235, 239 (5th Cir. 2003) (approving the use of "mitigated FONSIs"). On December 18, 2003, the Corps

---

[2] The Corps placed the notice jointly with the state agency because Clean Water Act provisions required the applicant to obtain a state Water Quality Certification. See 33 U.S.C. § 1341.

[3] We discuss the specific conditions placed on the permit in greater detail below.

issued a § 404 permit allowing dredging and filling in 39.54 acres of the project's wetlands, conditioned on performance of specified mitigation measures.

## B. District Court Proceedings

Plaintiffs, residents who "live, work, and recreate" near the proposed development, sued to enjoin the permit. They alleged that the Corps had not complied with NEPA's requirements because it 1) did not prepare an EIS; 2) prepared an inadequate EA; and 3) failed to consider the project's direct, indirect, and cumulative effects. Both parties submitted cross-motions for summary judgment, at which point the district court granted Eric Bopp, a part owner of the property and member of the Planche family, permission to intervene on the side of the Corps.

The district court granted the plaintiffs' motion for summary judgment, concluding that the Corps had acted arbitrarily by issuing the §404 permit without preparing a full EIS in order to comply with NEPA. In finding the Corps's actions arbitrary, the district court held that the Corps's EA and FONSI were not justified under NEPA because the administrative record contained no support for the Corps's conclusion that the mitigation measures would render insignificant the identified adverse impacts of the project. Further, the court held that the arbitrariness of this action by the agency was exacerbated by its failure to consider

fully the cumulative adverse effects of the project with those of (1) 72 other permits already issued within a 3 mile radius; (2) the continued rapid growth and urbanization of that part of St. Tammany Parish; and (3) phases II and III of the developer's long range residential subdivision plans on the Planche family's other plots of land in the same area of St. Tammany Parish. The district court also held that the Corps improperly segmented the entire long range subdivision plans by considering only Phase I in developing its EA. O'Reilly v. U.S. Army Corps of Engineers, 2004 WL 179453 404 1 (E.D.La., August 10, 2004) at *6. Accordingly, the district court (1) granted the plaintiffs' motion for summary judgment;(2) denied the defendants' motion for summary judgment; and (3) enjoined the § 404 permit issued by the Corps to the developer.

The Corps and the intervenor appealed. On appeal, however, only the intervenor contends that the Corps's EA, FONSI, and permit should be affirmed. The Corps does not object to the EA or the FONSI being vacated and the case being remanded to the agency for further proceedings that may, if additional findings and reasons so warrant, lead to the preparation of a second EA and another mitigated FONSI. Both appellants, however, take issue with the district court's injunction, which apparently leaves the Corps no recourse but to prepare a full EIS before granting the developer a permit to dredge and fill wetlands.

III. Discussion of the District Court's Decision on the Merits

We review the district court's grant of summary judgment de novo. Terrebonne Parish Sch. Bd. v. Mobil Oil Corp., 310 F.3d 870, 877 (5th Cir. 2002). Therefore we, like the district court, may only set aside the Corps's decision not to prepare an EIS where a plaintiff establishes that the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also Marsh v. Or. Natural Res. Council, 490 U.S. 360, 375-376 (1989); Kleppe v. Sierra Club, 427 U.S. 390, 412 (1976).

Courts may not, of course, use review of an agency's environmental analysis as a guise for second-guessing substantive decisions committed to the discretion of the agency. However, this restriction does not turn judicial review into a rubber stamp. "In conducting our NEPA inquiry, we must 'make a searching and careful inquiry into the facts and review whether the decision . . . was based on consideration of the relevant factors and whether there has been a clear error of judgment.'" Marsh, 490 U.S. at 378.

The district court in this case based its decision on three grounds: (1) the Corps's failure to demonstrate the feasibility of the mitigation measures imposed; (2) the Corps's failure to consider the cumulative effects of the project, other permits, and area urbanization; and (3) the Corps's improper segmentation of Phase I of the project. We discuss each in turn.

10

A. The Feasibility of the Mitigation Measures

The district court held that "the administrative record contains no support for the Corps's conclusion that the mitigation measures would remove or reduce [to insignificance] the identified adverse impacts of the project. [T]he EA discusses the project's adverse impacts and describes the associated mitigation measures but nothing in the Document connects the two together." O'Reilly, 2004 WL 1794531 at *5.

We have consistently accepted the proposition that reliance on mitigation measures may reduce a project's impacts below the level of significance. In Spiller, 352 F.3d at 241, we explicitly approved that principle, while noting that "we have implicitly endorsed [such] use[.]" Id. (citing Sierra Club v. Espy, 38 F.3d 792, 803 (5th Cir. 1994) (holding that EAs satisfied NEPA where they considered appropriate alternatives, including mitigation measures) and Louisiana v. Lee, 758 F.2d 1081, 1083 (5th Cir. 1985) (holding that it was proper to consider restrictions placed on dredging permits in reviewing the agency's decision not to file an EIS)). Other circuits agree. See, e.g., Cabinet Mountains Wilderness v. Peterson, 685 F.2d 678, 682 (D.C. Cir. 1982); C.A.R.E. Now, Inc. v. Fed. Aviation Admin., 844 F.2d 1569 (11th Cir. 1988); Greenpeace Action v. Franklin, 14 F.3d 1324 (9th Cir. 1992); Roanoke River Basin Ass'n v. Hudson, 940 F.2d 58 (4th Cir.

11

1991); <u>Audubon Soc'y of Cent. Ark. v. Dailey</u>, 977 F.2d 428 (8th Cir. 1992).

Furthermore, the Supreme Court has held that proposed mitigation measures need not be laid out to the finest detail, even within the more labor-intensive context of an environmental impact statement. <u>Robertson v. Methow Valley Citizens Council</u>, 490 U.S. 332, 352 (1989) ("There is a fundamental distinction . . . between a requirement that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated . . . and a substantive requirement that a complete mitigation plan be actually formulated and adopted."); <u>Miss. River Basin Alliance v. Westphal</u>, 230 F.3d 170, 176-77 (5th Cir. 2000) (quoting <u>Robertson</u>, 490 U.S. at 352). Mindful of that distinction, we have still required that an EIS involving mitigation must include "a serious and thorough evaluation of environmental mitigation options for [a] Project to allow its analysis to fulfill NEPA's process-oriented requirements[.]" <u>Miss. River Basin Alliance</u>, 230 F.3d at 178. We have, moreover, noted that "mere perfunctory or conclusory language will not be deemed to constitute an adequate record and cannot serve to support the agency's decision not to prepare an EIS." <u>Citizen Advocates For Responsible Expansion, Inc. (I-Care) v. Dole</u>, 770 F.2d 423, 434 (5th Cir. 1985) (citing <u>Maryland-National Capital Park & Planning Comm'n v. U.S. Postal Serv.</u>, 487 F.2d 1029, 1039 & 1040 (D.C. Cir. 1973)); <u>see</u> <u>also</u> DANIEL

R. MANDELKER, NEPA LAW & LITIG. § 8:57 (2006) ("an environmental assessment does not require the full and 'reasonably complete' discussion of mitigation measures that is required in an impact statement. Agencies must develop the record to a reasonable degree, however, in a manner that thoroughly and fairly evaluates environmental consequences."). With these principles in mind, we examine the Corps's EA and the reasons set forth there for its conclusion that each significant environmental impact it had identified would be reduced to insignificance by its prescribed mitigation measure.[4]

i. Adverse Effects on Soils and Flood Capacity

The Corps's EA predicts that the project will have substantial, long-term, adverse effects on project site soils, including: 1) creation of anoxic and anaerobic conditions[5] due to

---

[4] Before beginning our review, we pause to note that a number of the mitigation measures discussed below are included as specific conditions on the § 404 permit. Specifically, the permittee must 1) obtain Corps approval for any additional work not shown in the drawings; 2) prevent any eroded material from entering adjacent wetlands and/or waterways during construction; 3) comply with local floodplain ordinances, regulations, or permits; 4) obtain a permit from the Louisiana Department of Wildlife and Fisheries; 5) create and record a state conservation servitude in perpetuity on a 100-foot wide buffer zone along the Timber Branch; and 6) contribute funds to the Louisiana Nature Conservancy sufficient to acquire, enhance, manage, and administer 47.5 acres of pine flatwood/savannah wetlands. A failure to comply will result in revocation of the permit.

[5] Anoxic and anaerobic contain little-to-no oxygen; they are, among other things, less hospitable to plant life and soil-dwelling

clearing, grading, excavation, and filling; 2) possible impairment of subsurface drainage due to substrate compaction;[6] and 3) decreased aquifer recharge capability due to an increase in impervious surfaces.[7] All of the above work could contribute to a possible reduction in the site's flood control functions, including increased surface runoff volume and rate; reduced subsurface lateral flow, storage, and recharge; and reduced filtration.

In discussing the role of mitigation in reducing these problems, the EA states that the drainage plan incorporated into the development relies on a 100-foot vegetated buffer zone for flood water storage as well as creating detention areas. Additionally, the plan would raise the elevation of the major road. The EA also notes that the drainage plan meets St. Tammany Parish requirements. The EA asserts, without data or analysis, that the project as mitigated should have "minimal [e]ffect" on flooding within the scope of a 25-year storm, although storms in categories

animals.

[6] Subsurface drainage refers to the movement of water through soil or rock beneath the surface of the land. Compacting, or compressing, the soil and rock in an area reduces the space available for water to flow. Such poor drainage can result in increased susceptibility to flooding and contribute to anoxic and anaerobic soil conditions.

[7] Underground aquifers "recharge" or take in more water largely as that water drains down through porous soil. Increasing the amount of impervious surfaces in an area (say, by paving), reduces the amount of water reaching the aquifer.

above a 25-year event could flood the development.[8]

### ii. Increased Non-Point Source Pollution

In its assessment of water quality impacts, the Corps's EA notes that the project could cause long-term, adverse impacts from increased non-point source pollution,[9] primarily in the roadside drainage swales incorporated in the project design. The EA asserts that the planned 100-foot vegetated buffer will minimize the amount of sediment entering the river and that the project will comply with St. Tammany Parish ordinances enacted to control sediment-laden run-off. The EA also states that "Best Management Practices will be incorporated into project construction and inclusion of vegetated drainage swales and greenspaces will filter run-off" and that "[c]ompliance with the recommendations/ requirements of local ordinances and/or 'Best Management Practices' should limit the volume of sediments entering local waterways." It neither describes what these practices may include nor how they will work. Similarly, the EA states that compliance with required state environmental

---

[8] A twenty-five year storm is a storm of such duration and intensity that it has a likelihood of occurring once in twenty-five years. See Kennecott v. U.S. Envtl Protection Agency, 780 F.2d 445, 455 (4th Cir. 1985).

[9] Non-point source pollution does not come from a clearly identified source or location, but rather from pollutants originally deposited on the ground and carried away in surface run-off water. David Zaring, "Agriculture, Nonpoint Source Pollution, and Regulatory Control: The Clean Water Act's Bleak Present and Future", 20 HARV. ENVTL L. REV. 515, 515 (1996).

permits "should eliminate the potential for contamination of ground water resources," but does not describe what these permits require.

### iii. Loss of Wildlife Habitat

The EA predicts "moderate to major" adverse impacts on wildlife habitat, which, in turn, would create "long-term" adverse impacts to wildlife in a localized area. The document also notes that the project will result in a long-term increase in noise to levels "loud and frequent enough to disturb wildlife" in adjacent areas. In discussing mitigation of habitat loss and other adverse impacts on wildlife, however, the EA states, without explanation, that the buffer zone "will mitigate some of the impact to aquatic organisms." When discussing habitat for non-aquatic wildlife the EA simply states that the buffer zone will be preserved and may provide habitat for some species, although others may be eliminated entirely.

### iv. Loss of Wetland Functions

The EA notes that the project will result in a total and complete loss of wetland functions for the developed portion of the site, which will, in turn, affect the remaining area directly affected by the development, as well as nearby wetlands and non-wetlands. Some of the mitigation discussion is built into the requirements pertinent to flood control, non-point source

16

pollution, and wildlife habitat, discussed above. Beyond that, the EA says only that "compensatory mitigation for wetland functionality losses will be required." The permittee must purchase credits for 47.5 acres of pine flatwood/savannah wetlands, which will be acquired from "an approved site within the same USGS hydrologic watershed."

### v. Adverse Effects on Traffic and Safety

The EA states that the project will result in "adverse and long-term" impacts on traffic and transportation patterns, and as a result, could lead to increased safety concerns. The discussion of mitigation, however, is limited to statements that "[a]ppropriate adjustments to the local highway system, such as warning signs, and traffic control signs or signals may be required to accommodate increases in traffic volume" and that areas of congestion points may need to be altered. The EA also mentions that the applicant indicated in 2000 that it would conduct a traffic study, and that the developer would fund "some identified improvements" in order to mitigate adverse impacts.

After reviewing the EA's findings of significant adverse environmental impacts that will result from the project together with its reasoning as to the feasibility of the described mitigation measures imposed, we conclude that the district court

17

correctly held that the EA fails to sufficiently demonstrate that the mitigation measures adequately address and remediate the adverse impacts so that they will not significantly affect the environment. The EA before us lists the potentially significant adverse impacts, and describes, in broad terms, the types of mitigation measures that will be employed. As is evident from our above review of the Corps's treatment of each individual potential impact, however, the EA provides only cursory detail as to what those measures are and how they serve to reduce those impacts to a less-than-significant level. Because the feasibility of the mitigation measures is not self-evident, we agree with the district court that the EA does not provide a rational basis for determining that the Corps has adequately complied with NEPA.

We recognize that an EA is meant to be a "'rough-cut, low-budget', preliminary look at the environmental impact of a proposed project." Spiller, 352 F.3d at 240. The record before us, however, is simply not sufficient to determine whether the mitigated FONSI relies on "'. . . mitigation measures which . . . compensate for any adverse environmental impacts stemming from the original proposal'" that, unmitigated, would be significant. Id. at 241 (quoting Cabinet Mountains Wilderness, 685 F.2d at 682). In other words, the EA fails to tell us "why the proposed agency action will not have a significant impact on the human environment." Coliseum Square, 465 F.3d at 224 (citing 40 C.F.R. §§

18

1501.4(e), 1508.13). We therefore agree with the district court's determination that, the Corps acted arbitrarily in relying only on the information in the current EA to support the issuance of its mitigated FONSI. In so holding, we pause to note that "[w]e have never said that deficiencies in an EA can only be cured by preparing an EIS, and that is not the law." Fritiofson v. Alexander, 772 F.2d 1225, 1248 (5th Cir. 1985) (overruled on unrelated grounds by Sabine River Auth. v. U.S. Dep't of Interior, 951 F.2d 669, 677 (5th Cir. 1992)). Our review of the record today indicates only that we lack the information that would allow us to defer to the Corps's determination that mitigation will reduce the project's effects below the level of significance.

## B. Cumulative Impacts

The intervenor argues that the district court incorrectly determined that "the EA is supported by no real analysis or data with respect to cumulative effects of this project." O'Reilly, 2004 WL 1794531 at *5. We begin by reviewing NEPA's specific requirements regarding cumulative impact analysis.

The CEQ's regulations define a project's cumulative impacts as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."

19

40 C.F.R. § 1508.7; see also 40 C.F.R. § 1508.25 (requiring that agencies take cumulative impacts into consideration during NEPA review). The regulation states that "[c]umulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7. In that vein, we have held that a consideration of cumulative impacts must also consider "[c]losely related and proposed or reasonably foreseeable actions that are related by timing or geography." Vieux Carre Prop. Owners, Residents, & Assocs., Inc. v. Pierce, 719 F.2d 1272, 1277 (5th Cir. 1983).

In this case, the intervenor challenges the district court's holding with regard to the Corps's treatment of cumulative impacts. That court found that the EA "merely recites the potential cumulative effects of the project in light of other wetlands destruction in the area but . . . is supported by no real analysis or data with respect to cumulative effects of this project." O'Reilly, 2004 WL 1794531 at *5.

The Corps has already issued 72 other § 404 permits within a three mile radius of the proposed development, covering a total of 18,086.4 acres, of which 400.9 are wetlands. The EA identifies those permits, and notes that they cumulatively required "[a] total of approximately 529.5 acres of compensatory mitigation." The Corps acknowledges that although "[c]umulative impacts associated with this particular project would be considered minor[,]" when

20

considered in conjunction with, <u>inter alia</u>, "historical development and land use practices," the cumulative effects "may become major." The Corps carefully - and succinctly - describes how such individual projects can collectively cause fragmenting of state wetlands and result in increasing environmental pressures due to development. It notes that "without local governments and the general public becoming pro-active in long-term land use planning and local watershed management and guiding development from the perspective of environmental stewardship, the potential for environmental impacts to approach a cumulatively significant level exists." Furthermore, it acknowledges that this permit covers only the first phase of a project that may have as many as three phases of development. Such language would seem to warrant a finding of significance, but instead the Corps states, without any exposition, that "mitigation for impacts caused by the proposed project, possible future project phases, and all Corps permitted projects will remove or reduce e[x]pected impacts."

As above, we agree with the district court that this bare assertion is simply insufficient to explain <u>why</u> the mitigation requirements render the cumulative effects of this project less-than-significant, when considered with past, present, and foreseeable future development in the project area, including the project's other two potential phases. The intervenor argues that "one may presume that through the mitigation requirement contained

in NEPA all permits issued prior to the one under consideration had their respective impacts mitigated to levels of insignificance." We cannot accept that presumption as legally and empirically valid, however, because the Corps's EA provides no rational basis for concluding that when the individually "mitigated-to-insignificant" effects of this permit are added to the actual post-dredge and fill effects of 72 other permits issued to third parties by the Corps in the area, that the result will not be <u>cumulatively</u> significant. In so holding, we do not, as Mr. Bopp asserts, ask the agency to treat the EA as a "local land-use planning guide." We simply agree with the district court's determination that the EA provides too little information as to the workability of the mitigation measures to conclude that the Corps took a "hard look" at the project, realistically assessed its individual and cumulative environmental effects, and reasonably found that the mitigation measures imposed will reduce those effects to a less-than-significant level.

### C. Improper Segmentation

Finally, the intervenor challenges the district court's determination that this project, the first phase of a possible three-phase development plan, constitutes "improper segmentation", or "piecemealing": "an attempt by an agency to divide artificially a 'major Federal action' into smaller components to escape the application of NEPA to some of its segments." <u>Save Barton Creek</u>

22

Ass'n v. Fed. Highway Admin., 950 F.2d 1129, 1139 (5th Cir. 1992). In so holding, the district court identified nothing that rendered the other two phases "impracticable, financially unattractive, or generally not feasible." O'Reilly, 2004 WL 1794531 at *6. It held that "[t]he record blaringly suggests that the sole reason that Phases II and III were eliminated . . . was to facilitate the issuance of the permit so that the project could get underway." Id. Ultimately, the district court found that "the current project represents a piecemealing approach for implementing the totality of the [entire three-phase] project." Id.

"'As a general rule under NEPA, segmentation of highway projects is improper for purposes of preparing environmental impact statements.'" Save Barton Creek, 950 F.2d at 1140 (quoting Piedmont Heights Civic Club, Inc. v. Moreland, 637 F.2d 430, 439 (5th Cir. Unit B 1981)). Although the question of piecemealing may arise when dealing with a multi-phase project, it presents a different problem than that reviewed in the preceding section on cumulative impacts. As we have discussed, an assessment of cumulative effects asks whether a project with individually "mitigated-to-insignificant" effects may yet result in significant environmental impacts when those effects are aggregated with the foreseeable effects of other environmentally impacting human activities and natural occurrences. An analysis of improper segmentation, however, requires that where "proceeding with one project will, because of functional or

23

economic dependence, foreclose options or irretrievably commit resources to future projects, the environmental consequences of the projects should be evaluated together." Fritiofson, 772 F.2d at n.10.[10]

To determine whether a single project is improperly segmented into multiple parts, this Circuit applies a four-part test that asks whether "the proposed segment (1) has logical termini; (2) has substantial independent utility; (3) does not foreclose the opportunity to consider alternatives; and (4) does not irretrievably commit federal funds for closely related projects." Save Barton Creek, 950 F.2d at 1140 (citing Piedmont Heights, 637 F.2d at 439). It is important to note that "projects", for the

---

[10] Scholars have noted that the "cumulative effects" and "improper segmentation" issues raise separate-but-similar questions:

> Federal agencies may plan a number of related actions but may decide to prepare impact statements on each action individually rather than prepare an impact statement on the entire group. This decision creates a "segmentation" or "piecemealing" problem....

> Another related issue is whether an environmental assessment or impact statement on a project or action must discuss the cumulative impacts of that project or action that occur outside the scope of the project or action. The issue here is what environmental impacts must be considered in an impact statement on a particular project or action, not whether a number of projects or actions must be gathered together in a single environmental assessment or impact statement.

Daniel R. Mandelker, NEPA LAW & LITIGATION § 9:11 (2006).

purposes of NEPA, are described as "proposed actions", or proposals in which action is imminent. 40 C.F.R. § 1508.23. "'[T]he mere 'contemplation of' certain action is not sufficient to require an impact statement.'" Fritiofson, 772 F.2d at 1240 (citing Kleppe, 427 U.S. at 404). While a cumulative impact analysis requires the Corps to include "reasonably foreseeable" future actions in its review, improper segmentation is usually concerned with projects that have reached the proposal stage. See Envtl. Def. Fund v. Marsh, 651 F.2d 983, 999 (5th Cir. 1981). We have stated that in rare cases "a court [may] prohibit segmentation or require a comprehensive EIS for two projects, even when one is not yet proposed, if an agency has egregiously or arbitrarily violated the underlying purpose of NEPA." Envtl. Def. Fund, 651 F.3d at n.19.

In this case, the current § 404 permit allows only the filling and dredging required to construct Phase I of the planned development. Although the project as originally submitted was a three-phase undertaking, the application as eventually approved included only the first stage. The Corps cites this decrease in scale as one of the project requirements that reduce the project's effects below the level of significance.

The district court did not apply the independent utility test laid out above, but simply stated that considering Phase I by itself constituted improper piecemealing because nothing in the record suggested that Phases II and III were "impracticable,

25

financially unattractive, or generally not feasible" and that the two phases were almost certainly "going to be financially viable in light of the expanding urbanization in St. Tammany Parish." O'Reilly, 2004 WL 1794531 at *6. Plaintiffs, too, argue that the current project is wrongly piecemealed because Phases II and III are reasonably foreseeable. While this argument is relevant to whether the Corps rationally addressed and mitigated the cumulative impacts, it does not appropriately address the improper segmentation question.

In this respect, we agree with Mr. Bopp that Vieux Carre Prop. Owners, Residents, & Assocs, Inc. v. Pierce, 719 F.2d 1272, 1277 (5th Cir. 1983), provides the relevant analogy. In that case, a multi-phase project was submitted, withdrawn, and resubmitted in a form that included one phase of the original project. Id. at 1276-78. The court held that the project had not been improperly segmented because the future phases remained in the speculative, planning stages. Id. at 1278 (citing Envtl. Def. Fund, 651 F.2d at 999 ("we are here dealing with two projects that are historically distinct, one of which is proposed and the other still in the process of study and design. In that situation, NEPA does not yet require the [agency] to evaluate the environmental impact of the [second project].")).

In the case before us, the record indicates that the three phases have independent utility - Phase I can stand alone without

26

requiring construction of the other two phases either in terms of the facilities required or of profitability. Neither plaintiffs nor the district court identify any evidence that construction of Phase I irretrievably commits federal funds to construction of Phases II and/or III or that the future phases have progressed to the "proposal" stage.[11] Nor do they identify any evidence suggesting that construction of Phase I will foreclose the Corps's ability to consider various alternatives to construction of either future phase. Indeed, Phases II and III would encompass a far larger quantity of wetlands (80% of their total acreage) than Phase I (which was 40-50% wetlands). The Corps's analysis of practicable alternatives to construction of future phases may, as a result, prove far different than its analysis for Phase I.

On this point, therefore, we reverse the district court's judgment. The record before us does not reflect that the Corps must have considered the possible future second and third phases as part of the present project in conducting its EA and preparing its FONSI, nor that in failing to do so the Corps has arbitrarily

---

[11] Improper segmentation can occur absent the expenditure of federal funds: irrevocable commitment of federal funding is only one of the factors a court should consider in determining whether a project has been improperly segmented. Save Barton Creek, 950 F.2d at 1140. The project may yet be susceptible of improper segmentation: other factors look to the degree of independent function and utility of the project standing alone. Id. The point of the inquiry is to determine whether the agency artificially divided a "major Federal action" into smaller components to escape the application of NEPA to some of its segments. Id.

violated the underlying purpose of NEPA. Phases II and III are relevant to the EA insofar as they relate to the Corps's analysis of cumulative impacts. Conducting an EA for Phase I alone, however, does not offend the prohibition against piecemealing projects in order to avoid NEPA requirements. We cannot say that the Corps has acted arbitrarily in this respect.

## IV. Discussion of the District Court's Remedy

As we read the district court's judgment, it enjoins the issuance of a dredge and fill permit until an EIS is completed. The judgment states only that the district court "has ENJOINED the § 404 permit . . . ." But in the conclusion of its Memorandum Opinion, the Court stated,

> The Corps acted arbitrarily, capriciously, or abused its discretion by issuing the § 404 permit without preparing a full EIS as required by NEPA. In light of the long-term and irreversible environmental impacts associated with this project, the Corp's [sic] action is wholly at odds with NEPA. Because the permit was issued without an EIS in violation of NEPA, Plaintiffs are entitled to an injunction.... Accordingly; . . . the § 404 permit . . . issued by the Department of the Army is hereby ENJOINED.

O'Reilly, 2004 WL 1794531 at *6.

Both the Corps and Mr. Bopp contend that the district court's injunction effectively and erroneously mandated that the Corps complete an EIS for the proposed project. They argue that the court, instead, should have remanded the case to the Corps with instructions to the agency to reconsider whether an EA or an EIS is

28

appropriate.

We review a district court's decision to issue a permanent injunction for abuse of discretion. VRC, LLC v. City of Dallas, 460 F.3d 607, 611 (5th Cir. 2006) (citing N. Alamo Water Supply Corp. v. City of San Juan, Tex., 90 F.3d 910, 916 (5th Cir.1996); Thomas v. Tex. Dept. of Criminal Justice, 220 F.3d 389, 396 (5th Cir.2000)). "'The district court abuses its discretion if it (1) relies on clearly erroneous factual findings when deciding to grant or deny the permanent injunction, (2) relies on erroneous conclusions of law when deciding to grant or deny the permanent injunction, or (3) misapplies the factual or legal conclusions when fashioning its injunctive relief.'" Liberto v. D.F. Stauffer Biscuit Co., Inc., 441 F.3d 318, 323 (5th Cir. 2006) (quoting Peaches Entm't Corp. v. Entm't Repertoire Assocs., 62 F.3d 690, 693 (5th Cir. 1995)).

Where, as here, a court determines that an agency has acted arbitrarily or capriciously, the APA permits the court to "hold unlawful and set aside" that action. 5 U.S.C. § 706(2). As a general rule, when "an agency decision is not sustainable on the basis of the administrative record, then 'the matter should be remanded to [the agency] for further consideration.'" Avoyelles Sportsmen's League, Inc. v. Marsh, 715 F.2d 897, 905 (5th Cir. 1983) (quoting Camp v. Pitts, 411 U.S. 138, 143 (1973)); see also Vt. Yankee Nuclear Power Corp. v. Nat'l Res. Def. Council, Inc.,

29

435 U.S. 519, 549 (1978). Only in "rare circumstances" is remand for agency reconsideration not the appropriate solution. See <u>Fla. Power & Light Co. v. Lorion</u>, 470 U.S. 729, 744 (1985) (". . . the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."). We have previously addressed this precise question within the NEPA context:

> It is also clear that a decision to forego preparation of an EIS may be unreasonable for at least two distinct reasons: (1) the evidence before the court demonstrates that, contrary to the FONSI, the project may have a significant impact on the human environment, <u>see</u>, <u>e.g.</u>, <u>Lee</u>, 758 F.2d at 1085, or (2) the agency's review was flawed in such a manner that it cannot yet be said whether the project may have a significant impact, <u>see</u>, <u>e.g.</u>, <u>La. Wildlife Fed'n v. York</u>, 761 F.2d 1044, 1053 (5th Cir. 1985); <u>Found. on Economic Trends v. Heckler</u>, 756 F.2d 143, 154 (D.C. Cir. 1985). The appropriate relief, moreover, depends upon which of these findings the district court makes. If the court finds that the project may have a significant impact, the court should order the agency to prepare an EIS. <u>Lee</u>, 758 F.2d at 1085; <u>Save Our Ten Acres v. Kreger</u>, 472 F.2d 463, 467 (5th Cir. 1973). If the court finds, on the other hand, that the EA is inadequate in a manner that precludes making the determination whether the project may have a significant impact, the court should remand the case to the agency to correct the deficiencies in its analysis. <u>See</u> <u>York</u>, 761 F.2d at 1053 ("[we do] not order [an] . . . EIS because the question of whether the Project may have significant adverse impacts is still an open one"); <u>Found. on Economic Trends</u>, 756 F.2d at 154 ("until [the agency] completes such an evaluation the question whether the experiment requires an EIS remains an open one").

<u>Fritiofson</u>, 772 F.2d at 1238-39.[12]

---

[12] Other circuits follow an approach similar to that used by this circuit in <u>Fritiofson</u>. <u>See</u>, <u>e.g.</u>, <u>Jones v. Gordon</u>, 792 F.2d 821, 829 (9th Cir. 1986); <u>Found. on Economic Trends</u>, 756 F.2d at 154 (D.C. Cir. 1985); <u>Middle Rio Grande Conservancy Dist. v. Norton</u>, 294 F.3d 1220, 1226 (10th Cir. 2002). In fact, some

The district court in this case set out to answer the question of whether the Corps was arbitrary or capricious "in concluding that the mitigation measures, upon which the permit was conditioned, reduced the otherwise significant impacts of the project to a level of insignificance." O'Reilly, 2004 WL 1794531 at *4. In order to reach its affirmative answer to that question, the court found as follows:

> 1) that "the Corp's [sic] failure to employ any analysis or gather any data with respect to its mitigated FONSI rendered its decision arbitrary or capricious[]" (Id. at *5);
>
> 2) that "the Corps acted arbitrarily and capriciously in concluding that the cumulative effects of the project were sufficiently mitigated" where "the EA [was] supported by no real analysis or data with respect to [that issue]" (Id.); and
>
> 3) that "the Corps acted arbitrarily or capriciously in issuing the permit without considering the effect of the other two [reasonably foreseeable] phases [of the development]" (Id. at *6).

We read the district court's language as describing flaws in the Corps's methodology that render its ultimate conclusion unreliable and that therefore warrants remand to the agency, per the holding quoted in Fritiofson, above. In other words, the district court found that the administrative record did not contain sufficient information to support the agency's conclusion that mitigation

---

circuits do not permit the court to ever make the determination that a project's effects are significant; instead, those courts require that the court always remand to the agency. See, e.g., Nat'l Audubon Soc'y v. Hoffman, 132 F.3d 7, 18 (2d Cir. 1997).

rendered the project's impacts insignificant.

Appellees argue that the district court did, in fact, find that the project's impacts were significant, based on its statement that "[u]ndoubtedly, the environmental impacts associated with [the project] are significant even when the future phases and cumulative impacts are not taken into consideration." Id. at *4. That statement, however, is taken out of context. As the district court noted, the Corps does not appear to "[disagree] with Plaintiff's contention that there are significant environmental impacts associated with the proposed . . . project." O'Reilly, 2004 WL 1794531 at *3. "Rather, the crux of the dispute is whether the Corps's FONSI, which was predicated upon the permittee agreeing to certain mitigation measures, was arbitrary, capricious, or an abuse of discretion." Id. The district court focused on the Corps's reliance on mitigation, holding that the Corps's analysis was insufficient to support its conclusions. At no point did the district court conclude that there was no possibility that the project's effects could become insignificant after mitigation. Since that possibility has not been entirely foreclosed, the proper remedy under this court's precedents is to "remand the case to the agency to correct the deficiencies in its analysis." Fritiofson, 772 F.2d at 1239.

Plaintiffs also argue that the district court's injunction should not be read as requiring an EIS, but rather as simply

32

enjoining the permit until the Corps has complied with NEPA. In doing so, plaintiffs rely on the fact that the bare language of the separate document final judgment enjoins the § 404 permit, and says nothing about requiring an EIS. Plaintiffs assert that the language of the Order serves only to "explain[] why the permit is illegal[.]" We disagree. The most plausible reading of the opinion's concluding paragraph, which explicitly describes the Corps's offense as "issuing the § 404 permit without preparing a full EIS as required by NEPA," is that the Corps can only <u>become</u> compliant by completing an EIS. As we have discussed, that reading runs afoul of our precedent on the issue. For all of the foregoing reasons, we conclude that the district erred in enjoining the Corps' issuance of a § 404 permit until an EIS is prepared. Therefore, in affirming the district court's judgment in part, and reversing it in part, we amend the district court's injunction order to enjoin the issuance of the permit pending our remand of the case to the Corps for further proceedings consistent with this opinion and the instructions set forth below.

## V. Conclusion

Accordingly, we (1) AFFIRM the district court's determination that the Corps acted arbitrarily in issuing a FONSI on the basis of the EA presented for the reasons assigned herein; (2) AMEND the injunction ordered by the district court to enjoin the Corps from

33

issuing a § 404 permit herein until further orders of the district court consistent with this opinion; (3) REVERSE the balance of the district court's judgment; and (4) REMAND the case to the Corps for further proceedings including the preparation of a new EA, a new FONSI, or an EIS, or other appropriate disposition, consistent with this opinion.

DISTRICT COURT JUDGMENT AFFIRMED IN PART, AMENDED IN PART, REVERSED IN PART. CASE REMANDED TO THE UNITED STATES ARMY CORPS OF ENGINEERS FOR FURTHER PROCEEDINGS AS DIRECTED CONSISTENT WITH THIS OPINION.