United States Court of Appeals
Fifth Circuit

**F I L E D**

**December 12, 2003**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 02-50956
_____

ETHEL SPILLER; ET AL.,

                                                    Plaintiffs,

MARIAN COLLINS; BARTON SPRINGS/EDWARDS
AQUIFER CONSERVATION DISTRICT;
DAVID ROBERTSON,

                                        Plaintiffs - Appellants,

CITY OF AUSTIN,

                                Intervenor Plaintiff - Appellant,


                          versus

THOMAS E. WHITE, Etc.; ET AL.,

                                                    Defendants,

THOMAS E. WHITE, in his official capacity
as Acting Secretary of the Department of
the Army; NORMAN Y. MINETA, SECRETARY,
DEPARTMENT OF TRANSPORTATION; CHRISTINE
T. WHITMAN, ADMINISTRATOR, UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY; UNITED
STATES OF AMERICA,

                                        Defendants - Appellees,

LONGHORN PARTNERS PIPELINE LP,

                                        Defendant - Appellee.

_____

Appeal from the United States District Court
for the Western District of Texas

_____

Before JOLLY, SMITH, and EMILIO M. GARZA, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Before this court is the joint decision of two government agencies <u>not</u> to conduct a full-scale environmental impact study of the environmental effects of a proposal to use a pre-existing pipeline to transport gasoline and other petroleum products across the state of Texas. The government agencies did perform an initial environmental assessment but declined to engage in any further studies after concluding that the environmental impact of the proposed use of the pipeline would not be significant. The petitioners consist of a variety of Texas cities and governmental entities strongly opposed to the proposed use of this particular pipeline. They urged the district court -- and they now urge this court -- to order the government agencies to proceed with a full-fledged environmental impact study, contending that the agencies' finding of no significant environmental impact was arbitrary and capricious and contrary to law. The district court upheld the conclusion of the government agencies. We affirm.

## I. Background

A. Statutory Background

This case arises under the network of the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321-4370d, "a statute drafted to ensure that federal agencies 'carefully consider detailed information concerning significant environmental impacts,' and at the same time 'guarantee that the relevant

information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.'" Sabine River Authority v. U.S. Dept. of Interior, 951 F.2d 669, 676 (5th Cir. 1993) (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332 (1989)). In essence, the NEPA framework requires federal agencies to prepare a detailed Environmental Impact Statement ("EIS") for all "major federal actions significantly [affecting] the quality of the human environment." 42 U.S.C. § 4332(C).

The threshold determination of whether the effect of the proposed action is sufficiently "significant" to necessitate the production of an EIS is made by the preparation of an Environmental Assessment ("EA"). Sabine River, 951 F.2d at 677. The EA is a "concise" document that "briefly" discusses the relevant issues and either reaches a conclusion that preparation of an EIS is necessary or concludes with a "Finding of No Significant Impact" ("FONSI"). Id. An EA is conducted to "provide sufficient evidence and analysis for determining whether to prepare an [EIS]." 40 C.F.R. § 1508.9(a)(1). "The EA is a rough-cut, low-budget environmental impact statement designed to show whether a full-fledged environmental impact statement -- which is very costly and time-consuming to prepare and has been the kiss of death to many a federal project -- is necessary." Sabine River, 951 F.2d at 677 (internal quotations and citations removed). Thus, the ultimate purpose of the EA is to lead to one of two findings: "either that

3

the project requires the preparation of an EIS to detail its environmental impact, or that the project will have no significant impact . . . necessitating no further study of the environmental consequences which would ordinarily be explored through an EIS." Id. If the former is found, then the agency must proceed with a full blown EIS; if the latter is found, the agency issues a FONSI and has no further obligations under NEPA. Id.

Notably, the NEPA statutory framework provides no substantive guarantees; it prescribes adherence to a particular process, not the production of a particular result. Robertson, 490 U.S. at 350. NEPA "is a procedural statute that demands that the decision to go forward with a federal project which significantly affects the environment be an environmentally conscious one." Sabine River, 951 F.2d at 676. The statute "does not command the agency to favor an environmentally preferable course of action, only that it make its decision to proceed with the action after taking a 'hard look at environmental consequences.'" Id. (quoting Robertson, 490 U.S. at 350). Indeed, "NEPA does not prohibit the undertaking of federal projects patently destructive of the environment; it simply mandates that the agency gather, study, and disseminate information concerning the projects' environmental consequences." Id. Thus, while "[o]ther statutes may impose substantive environmental obligations on federal agencies, . . . NEPA merely prohibits uninformed -- rather than unwise -- agency action." Id.

4

B. Factual and Procedural History

This case concerns a pipeline that runs across the state of Texas between Houston and El Paso. Along its way, the pipeline passes through the City of Austin and across several rivers, streams and wetlands. In addition, it lies atop several aquifers and aquifer recharge zones. Exxon Pipeline Company originally constructed the pipeline between 1949 and 1950 and used it to transport crude oil until 1995. In 1997, Exxon sold the pipeline to Longhorn Partners Pipeline, L.P. ("Longhorn"), a Delaware limited liability partnership headquartered in Dallas, Texas. Longhorn purchased the pipeline intending to use it to transport gasoline and other petroleum products from Gulf Coast refineries to El Paso and then, perhaps, on to other states. The pipeline will eventually move approximately 225,000 barrels of gasoline per day across its lines.

On April 22, 1998, Mariane Collins, the Barton Springs-Edwards Aquifer Conservation District, and David Robertson filed a challenge to the proposed pipeline under NEPA.[1] In their original complaint, the plaintiffs sought injunctive relief, claiming that

---

[1]The Collins plaintiffs all claim to be potentially affected by the proposed use of the pipeline. Marian Collins is a rancher in Kimble County, Texas and claims she is totally dependent on water drawn from the Edwards-Trinity Plateau Aquifer which is allegedly threatened by this pipeline. David Robertson lives in Hayes County and claims to rely on well-water drawn from this same aquifer. The Barton Springs-Edwards Aquifer Conservation District is a political subdivision charged with the protection of the Barton Springs segment of the Edwards Aquifer.

NEPA obligated the federal government to perform a full-fledged review of the environmental impact of the proposed use of the Longhorn Pipeline. The suit was brought against Longhorn, the United States, the United States Department of Transportation ("DOT"), the Department of the Army, and the Environmental Protection Agency ("EPA"). Shortly thereafter, the City of Austin was allowed to intervene as the pipeline itself runs through the city.

After some initial negotiations, Longhorn and the government defendants entered into a settlement stipulation with the Collins plaintiffs and the City of Austin (collectively referred to hereafter as "the Collins plaintiffs"). Under this settlement, the EPA and the DOT (hereafter referred to as the "Lead Agencies") agreed to prepare an EA of the pipeline. The parties agreed that this EA would culminate in a FONSI or a notice of intent to prepare an EIS. Upon acceptance of the settlement stipulation, the district court issued an Agreed Order enjoining Longhorn from placing petroleum products in the pipeline until thirty days after the EA had been completed. The Agreed Order also specified that if the Lead Agencies issued a FONSI, the Collins plaintiffs could apply to the court to extend the injunction on the basis that the FONSI was arbitrary and capricious or otherwise in violation of the law under the Administrative Procedures Act ("APA"), 5 U.S.C. § 706.

In accordance with the settlement stipulation, the Lead Agencies prepared an EA. On October 28, 1999, the Lead Agencies issued the draft EA and a preliminary FONSI for public review and comment (in accordance with 40 C.F.R. § 1506.6). The preliminary FOSNI was a so-called "mitigated FONSI" which means that its issuance was predicated on Longhorn's engaging or agreeing to engage in certain mitigation measures. These measures were designed to address the potentially significant environmental impacts of the pipeline and reduce the risks of them occurring to a level where they were deemed insignificant by the Lead Agencies. The Lead Agencies then held public hearings on the draft EA and the preliminary FONSI in Austin, Houston, Fredricksburg, Bastrop and El Paso and distributed hundreds of copies of the EA and FONSI in counties along the pipeline. Following these hearings, the submission of several thousand written comments on them, and after further deliberation, on November 3, 2000, the EPA and DOT issued a FONSI along with the final EA.

On February 5, 2001, the District Court granted the Collins plaintiffs leave to amend their initial complaints. In their amended complaint, the Collins plaintiffs contended that (1) the Lead Agencies' decision to issue a FONSI instead of preparing an EIS was contrary to NEPA and was arbitrary and capricious in violation of the APA, and (2) the Lead Agencies and Longhorn breached the settlement agreement. In response, Longhorn and the

7

Lead Agencies claimed that the decision to issue a FONSI was not arbitrary and capricious and that they had complied with the settlement agreement. All parties filed summary judgment motions on June 10, 2002.

On July 19, 2002, the district court granted summary judgment in favor of Longhorn and the Lead Agencies. It found that the Lead Agencies' decision to issue a FONSI and not prepare an EIS was not arbitrary and capricious nor was it in any other way unlawful or in violation of NEPA. Specifically, it found that the Lead Agencies had taken the requisite "hard look" at the environmental impact of the Longhorn Pipeline and had reasonably determined that the impact would not be significant. In addition, it found that Longhorn had not breached the settlement agreement.

On August 20, 2002, the Collins plaintiffs filed a timely notice of appeal to this Court. In this appeal, the Collins plaintiffs take issue with the district court's finding that the Lead Agencies' decision to issue a FONSI and not to prepare an EIS was not arbitrary and capricious or otherwise in violation of the law. They urge this Court to reverse this finding, remanding with instructions that the district court remand the proceeding to the Lead Agencies for preparation of an EIS, or alternatively, for

reconsideration of the FONSI in response to a judicial determination that it was issued in violation of NEPA.[2]

## II. Standard of Review

Because NEPA dictates no particular substantive result, an agency decision not to conduct an EIS based on a FONSI is reviewable only on procedural grounds. A party objecting to such a decision brings such a challenge under the APA, 5 U.S.C. § 706(2)(A). Such parties face a high bar to success, however, as NEPA-related decisions are accorded a considerable degree of deference. The Supreme Court has held that in reviewing agency decisions involving alleged NEPA violations, courts are to uphold the agency's decision unless the decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Marsh v. Oregon National Res. Council, 490 U.S. 360, 375 n.21 (1989)(quoting 5 U.S.C. § 706(2)(A)). Under this "highly deferential" standard, a reviewing court has the "least latitude in finding grounds for reversal" of an agency decision and "may not substitute its judgment for that of the agency." Sabine River, 951 F.2d at 678 (internal quotations and citations omitted). Thus, with respect to this case, our deferential role as a reviewing court is limited to ensuring that the Lead Agencies took a "hard look" at the environmental consequences; we cannot interject

---

[2]The Collins plaintiffs do not appeal the district court's grant of summary judgment on their claim that Longhorn breached its settlement agreement. Thus, the sole issue before us on appeal is the validity of the Lead Agencies' decision not to conduct an EIS.

ourselves within the area of discretion of the agencies as to the ultimate choice of the action to be taken. <u>Kleppe v. Sierra Club</u>, 427 U.S. 390, 410 n. 21 (1976). In doing so, we evaluate the record <u>de</u> <u>novo</u>. We undertake the same task as the district court, reviewing the materials submitted there and determining whether the agency's conclusions were arbitrary and capricious or contrary to law. <u>Sabine River</u>, 951 F.2d at 679.

### III. Discussion

Before examining the Collins plaintiffs' arguments in detail, we should first note how exceedingly thorough and comprehensive the instant environmental assessment prepared by the Lead Agencies appears to be. The law only requires that an EA be a "rough-cut," "low-budget," preliminary look at the environmental impact of a proposed project. <u>Sabine River</u>, 951 F.2d at 677. This EA, however, is anything but rough-cut or low-budget. One and a half years in the making, it consists of four lengthy volumes numbering over 2,400 pages. It incorporates not only the analysis of agency personnel but also studies from independent experts in pipeline operations and safety, endangered species, hydrology, geology, lake and stream modeling, chemistry, risk analysis, and emergency response planning and implementation. It also incorporates the Lead Agencies' review of over 6,000 written comments and numerous oral comments from six separate public meetings held throughout potentially affected areas in the state of Texas. Its issuance was predicated on Longhorn's agreeing to employ and maintain a variety

10

of mitigation measures designed to lower the degree of identified risk of impact to acceptable levels. Indeed, in many ways, this EA is more akin to a full-blown EIS; it is unclear exactly what more the Lead Agencies could have done to evaluate the significance of this pipeline's impact.

We should also note that we find nothing objectionable about the fact that the issuance of the FONSI was predicated on Longhorn agreeing to certain mitigation measures. This Court has never explicitly upheld the issuance of a so-called "mitigated FONSI." This situation occurs when an agency or an involved third party agrees to employ certain mitigation measures that will lower the otherwise significant impacts of an activity on the environment to a level of insignificance. In this way, a FONSI could be issued for an activity that otherwise would require the preparation of a full-blown EIS. Other circuits have endorsed such a practice. For example, in Cabinet Mountains Wilderness v. Peterson, 685 F.2d 678 (D.C. Cir. 1982), the District of Columbia Circuit Court of Appeals held that "if, however, a proposal is modified prior to implementation by adding specific mitigation measures which completely compensate for any possible adverse environmental impacts stemming from the original proposal, the statutory threshold of significant environmental effects is not crossed and an EIS is not required." Other circuits have concurred with this result. See, e.g., C.A.R.E. Now, Inc. v. FAA, 844 F.2d 1569 (11th Cir. 1988); Greenpeace Action v. Franklin, 14 F.3d 1324 (9th Cir.

11

1992); Roanoke River Basin Ass'n v. Hudson, 940 F.2d 58 (4th Cir. 1991); Audubon Soc'y of Cent. Arkansas v. Dailey, 977 F.2d 428 (8th Cir. 1992). While we have never explicitly upheld the use of a mitigated FONSI, we have implicitly endorsed their use in Sierra Club v. Espy, 38 F.3d 792, 803 (5th Cir. 1994) (holding that EAs satisfied NEPA where they considered appropriate alternatives, including mitigation measures), and Louisiana v. Lee, 758 F.2d 1081, 1083 (5th Cir. 1985) (holding that it was proper to consider restrictions placed on dredging permits in reviewing the agency's decision not to file an EIS and citing Cabinet Mountains, 685 F.2d at 682). Accordingly, we find no basis for objecting to the mitigated nature of FONSI issued here. This is particularly true given the fact that the original settlement agreement between the parties specifically endorsed the use of a mitigated FONSI.

Despite its comprehensive nature, the Collins plaintiffs take issue with the conducted EA and issued FONSI on three basic grounds. First, they contend that the Lead Agencies' assessment of the environmental impact of the pipeline was conducted in bad faith – that a political decision to issue a FONSI had been made beforehand and the entire process was specifically tailored to produce this result. Second, they assert that the Lead Agencies did not follow the guidelines set out by relevant NEPA regulations; specifically, they argue that the Lead Agencies failed to consider and evaluate all the requisite factors stipulated by these regulations. Finally, the Collins plaintiffs assert that even

12

assuming a sufficiently comprehensive "hard look" was taken, the Lead Agencies' findings were arbitrary and capricious since a clear and rational examination of the record indicates that the Longhorn Pipeline would have a significant effect on the environment. The Collins plaintiffs made all three of these arguments to the district court, which rejected them. We do so as well.

As to their first contention, the Collins plaintiffs essentially assert that the EA prepared here was a sham -- contrived reports specifically tailored to rationalize a result that had already been predetermined. They assert that the decision to not prepare an EIS was a political decision made in advance by the Council on Environmental Quality ("CEQ") -- an executive branch political organization -- and forced on the Lead Agencies. Consequently, they argue that there was never any good faith attempt to take the required "hard look" at any potentially significant environmental effects the proposed action would have. Instead, the EA that ultimately issued was a foregone conclusion, whatever may have been the actual level of the significance of the pipeline's impacts.

We find no merit to this argument. Although it is true that agencies are expected to engage in good faith fact-finding, when their findings are challenged as arbitrary and capricious, the agencies' actions are judged in accordance with their stated reasons. See, e.g., In re: Comptroller of the Currency, 156 F.3d 1279 (D.C. Cir. 1998). Thus, the "actual subjective motivation of

13

agency decisionmakers is immaterial as a matter of law -- unless there is a showing of bad faith or improper behavior." Id. at 1279-80. There is no evidence here that the Lead Agencies acted improperly or in bad faith. The assessment they prepared was noteworthy for its exhaustive and extensive nature. Even more detrimental to the Collins plaintiffs' argument is that there is no evidence of a causal link between the Lead Agencies' decision to issue a FONSI and the alleged political machinations; the record suggests that the CEQ's involvement did not come until after the Lead Agencies had made the initial decision not to prepare an EIS. Accordingly, there is no reason to overturn the Lead Agencies' decision on these grounds.

As to the second contention, the Collins plaintiffs accurately note that in taking a "hard look" at whether a proposed activity's impact will be significant, the relevant regulations instruct the Lead Agencies to consider both the "context" and the "intensity" of the impacts. 40 C.F.R. § 1508.27. According to these regulations, consideration of context means that "the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality." 40 C.F.R. § 1508.27(a). Intensity is defined as "the severity of impact." 40 C.F.R. § 1508(b). The regulation then goes on to provide ten areas agencies should consider in evaluating

14

"intensity." See id.[3]  The Collins plaintiffs contend that while the Lead Agencies' EA report accurately lists all ten factors as being components of their assessment, their failure to specifically address each of them separately and directly in this report requires reversal.  We do not think, however, that the Lead Agencies' decision should be overturned on such formalistic grounds.  Notably, the factors listed in the regulation do not

[3]The ten listed factors are:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.
(2) The degree to which the proposed action affects public health or safety.
(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.
(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.
(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.
(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.
(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment.  Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.
(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.
(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.
(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

15

appear to be categorical rules that determine by themselves whether an impact is significant. Instead, they are simply a list of relevant factors that should be considered in gauging whether an impact is "intense" and, therefore, significant. As such, all that would have to be shown is that all the factors were in some way addressed and evaluated; whether this was done in factor-by-factor fashion is irrelevant. We think that the record clearly indicates that each of these factors received adequate attention and evaluation in the Lead Agencies' decision-making process. Accordingly, we find no merit to this argument.

The Collins plaintiffs finally assert that, even assuming a comprehensive "hard look" was taken, the conclusion that the impact of the Longhorn Pipeline was not significant was still arbitrary and capricious since the Lead Agencies' conclusion was both grossly unsupported by the facts found and premised on bad science and/or inaccurate information. They argue that any reasonable consideration of the ten requisite factors would have led a rational decision-maker to conclude that the environmental impact of the Longhorn Pipeline would be significant. According to them, the EA report, the FONSI, and its underlying studies and findings are "unduly optimistic," "confusing," "unreasonable" and "defy common sense." To substantiate these allegations, they offer the detailed testimony of five expert witnesses retained by them.

We find no merit to this contention. The fact that the Collins plaintiffs or their experts take great issue with the

factual findings and ultimate conclusions of the Lead Agencies does not render those findings and conclusions "arbitrary and capricious." As we noted earlier, government agencies -- and not the federal courts -- are the entities NEPA entrusts with weighing evidence and reaching factual conclusions:

> Where conflicting evidence is before the agency, the agency and not the reviewing court has the discretion to accept or reject from the several sources of evidence. The agency may even rely on the opinions of its own experts, so long as the experts are qualified and express a reasonable opinion.

Sabine River, 951 F.2d at 678.

Indeed, even if we were convinced that the Collins plaintiffs' experts were more persuasive than those relied upon by the Lead Agencies, we would still be compelled to uphold the Lead Agencies' finding so long as their experts were qualified and their opinions reasonable. Id.; Marsh, 490 U.S. at 378 ("[w]hen specialists express conflicting views, an agency must have the discretion to rely on the reasonable opinions of its own qualified experts, even if, as an original matter, a court might find contrary views more persuasive.").

There is no evidence here that the Lead Agencies' experts are unqualified, nor do their opinions seem unreasonable to us. The Collins plaintiffs' experts point to a number of specific flaws they claim exist in the Lead Agencies' fact-finding or conclusions. These include allegations that the Lead Agencies should have conducted more comprehensive studies than they chose to do, that

17

they utilized inaccurate and misleading statistical methodology in analyzing the risks of pipeline leakage, that they ignored or finessed the implications of key findings by the Lead Agencies' own experts in many instances, and that they inappropriately deferred to Longhorn for data and then relied uncritically upon it. Unsurprisingly, the Lead Agencies and Longhorn take issue with each of these assertions, answering each point-by-point in their briefs. After analyzing this back-and-forth between the parties, it seems clear that whatever the merits of the Collins plaintiffs' arguments that the Lead Agencies' decision-making process was less than perfect, it was not unreasonable. Instead, the dispute between the Collins plaintiffs and the defendants here is best classified as a classic battle of the experts, with each party asserting that their analysis is more reasonable than the other's. Under the highly deferential standard afforded to agencies pursuant to NEPA, however, it is not the job of the federal courts to intervene in this fight.[4] The agencies have made their decision. It was not

_____

[4]The Collins plaintiffs advance the argument that even if the environmental impact of the Longhorn Pipeline is not clearly significant, it is at least a close call and, as they claim, close calls are supposed to lead to an EIS. For this proposition of law, they rely on National Audubon Soc'y v. Hoffman, 132 F.3d 7, 13 (2d Cir. 1997)("[w]hen the determination that a significant impact will or will not result from the proposed action is a close call, an EIS should be prepared."). This Court, however, has never announced such a rule. Indeed, it would be difficult to do so, given the seeming conflict between such a rule and the highly deferential "arbitrary and capricious" standard set out in Sabine River.

18

arbitrary and capricious.  We are thus obliged to defer to their

expert judgment.[5]

## IV.  Conclusion

As we noted earlier, NEPA does not guarantee any substantive

results; all it ensures is that a particular process will be

---

[5]We should note that our deference to the Lead Agencies fact-finding and conclusions includes deference to their judgment as to whether any particular environmental impact of the proposed pipeline rises to the level of significance.  The Collins plaintiffs argue that under the NEPA framework, the determination of whether an impact is significant must be objective, factual and quantitative in nature and should not involve any subjective, qualitative "judgment calls."  They argue that the final EA issued here is inappropriately "larded" with such judgement calls, particularly on the subject of how much risk constitutes significant risk; it should therefore be overturned.  The problem with this contention is that, as a practical matter, a determination of significance cannot be a completely objective inquiry because the meaning of the term "significance" for purposes of the NEPA statute is not clear on its face.  Vieux Carre Property Owners, Residents and Assoc's., Inc. v. Pierce, 719 F.2d 1272, 1279 (5th Cir. 1983)("There is no hard and fast definition of 'significant' effect.").  As such, determining whether significance exists inherently involves some sort of a subjective judgment call. Save Our Ten Acres v. Kreger, 472 F.2d 463, 467 n.7 (5th Cir. 1973) (significance is "in large part a judgment based on the circumstances of the proposed action.").  This must include judgment calls about how much risk equals significant risk, i.e., judgment calls about "acceptable risk."  This observation has been made by the Second Circuit in City of New York v. U.S. Dep't of Transp., 715 F.2d 732 (2d Cir. 1983).  There, the court explicitly held that agencies have "latitude in determining whether the risk is sufficient to require the preparation of an EIS."  Id. at 746 n.14.  This holding is sound because the "concept of overall risk incorporates the significance of possible adverse consequences discounted by the improbability of their occurrence."  Id. at 738. That is not to say that any such judgment calls must be rubber-stamped by a reviewing court; they are still subject to the arbitrary and capricious standard of review.  However, we do say that the simple fact that a judgment call was made is not enough to render the determination of significance (or non-significance) invalid under NEPA.

19

followed.  Herein lies the problem for the Collins plaintiffs.
They really don't want more process.  Indeed, considering the
extensive and comprehensive nature of the EA conducted here, it is
unclear exactly what more process would involve.[6]  What they really
desire is a substantive result:  convinced that it poses a great
threat to the health and safety of its citizens and the environment
in general, the Collins plaintiffs want this pipeline project
killed.  Unfortunately for their case, and whatever of the merits
of that position, this outcome cannot be secured in this federal
court proceeding.  The Lead Agencies here have complied with the
NEPA statute and its accompanying regulations in every way.  They
have  conducted an exhaustive assessment of the environmental
effects of this proposed pipeline and, after consideration,

---

[6]The Lead Agencies and Longhorn have argued that requiring the preparation of an EIS here would be a waste of time and resources, given the fact that the EA prepared here contains all the functional elements of an EIS.  We find this argument persuasive. In Vieux Carre Property Owners, Residents and Assoc's., Inc. v. Pierce, 719 F.2d 1272, 1282 (5th Cir. 1983), this court upheld the decision of an agency not to conduct an EIS where the "objectives reflected in the [f]inal [EA] and the procedures followed in its preparation were extremely thorough and resulted in a document much akin to a detailed environmental impact statement."  But see State of Louisiana v. Lee, 758 F.2d 1081 (5th Cir. 1985) (holding that an EA prepared by an agency in that case was not the functional equivalent of an EIS).  Like the EA in Vieux Carre, the EA here has all the hallmarks of an EIS:  there were public hearings and costly, extensive, and comprehensive environmental studies which produced reams of material data and resulted in 2,400 pages of analysis.  Accordingly, it is unclear whether the time and expense required to prepare an EIS after an EA will result in any incremental benefits.  Forcing the Lead Agencies to prepare an EIS would likely be unnecessarily duplicative and a waste of resources.

20

concluded that those effects were not significant. Whether we agree or disagree with that conclusion, we cannot call it arbitrary and capricious. Accordingly, we have no ability to disturb it. Therefore, the district court's grant of summary judgment in favor of the defendants is AFFIRMED in all respects.

AFFIRMED