# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 12, 2023

Lyle W. Cayce
Clerk

_____

No. 22-30608

_____

LORETTO O'REILLY, JR.; HEALTHY GULF; COALITION FOR
RESPONSIBLE ZONING; SIERRA CLUB, DELTA CHAPTER,

*Plaintiffs—Appellants,*

*versus*

ALL STATE FINANCIAL COMPANY,

*Intervenor—Appellee,*

ST. TAMMANY PARISH GOVERNMENT,

*Intervenor Plaintiff—Appellee,*

UNITED STATES ARMY CORPS OF ENGINEERS; SCOTT A.
SPELLMON, *Lieutenant General,*

*Defendants—Appellees.*

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:21-CV-1027

_____

Before WIENER, GRAVES, and DOUGLAS, *Circuit Judges.*

No. 22-30608

Per Curiam:[*]

All State Financial Company ("All State") wishes to dredge and fill 24.58 acres of wetlands in St. Tammany Parish, Louisiana, to build a multi-use commercial and residential development. The United States Army Corps of Engineers ("Corps") issued All State a permit to do so under § 404 of the Clean Water Act ("CWA"), after determining that the project would have no significant impact on the environment. Plaintiffs, residents of St. Tammany and other concerned environmental groups, appeal the district court's affirmance of the Corps' decision. Because the Corps' Environmental Assessment ("EA") fails to articulate a reasonable basis for its Finding of No Significant Impact ("FONSI"), we reverse the district court and remand to the Corps for further proceedings consistent with this opinion.

## I. STATUTORY FRAMEWORK

The National Environmental Policy Act ("NEPA") imposes procedural requirements on public agencies to ensure that they consider "the environmental impact of their proposals and actions." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004) (citing 42 U.S.C. § 4332). In complying with its responsibilities under NEPA, an agency must first prepare an EA to "briefly" determine the potential environmental impacts of a proposed action. 40 C.F.R. § 1508.9.[1] An EA is a "rough-cut, low-budget" statement that evaluates whether the proposed action will "significantly affect[] the quality of the human environment." *Sabine River Auth. v. U.S.*

---

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

[1] The Council on Environmental Quality ("CEQ") published new rules in September 2020, revising earlier NEPA regulations, but the decisions challenged here were subject to the earlier version of the regulations. Thus, all citations to CEQ regulations herein refer to the regulations codified at 40 C.F.R. pt. 1500 (2018).

No. 22-30608

*Dep't of Interior*, 951 F.2d 669, 676 (5th Cir. 1992) (quoting 42 U.S.C. § 4332(2)(C)). If it will, the agency must prepare a more detailed Environmental Impact Statement ("EIS"), including, *inter alia*, information on any adverse environmental effects of the project, "alternatives to the proposed agency action," and "any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(C). If, on the other hand, the EA establishes that the action will not have a significant impact on the environment, the agency instead issues a FONSI. 40 C.F.R. § 1508.13.

In determining whether to prepare an EIS or issue a FONSI, an agency must take a "hard look" at the context and intensity of the project's potential impacts. *Spiller v. White*, 352 F.3d 235, 242 (5th Cir. 2003). Such impacts include the direct, indirect, and cumulative effects of the action. 40 C.F.R. §§ 1508.7-8. Considering the "context" of the effects requires that "the significance of an action [] be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality." 40 C.F.R. § 1508.27(a). "Intensity," on the other hand, concerns the "severity of the impact." 40 C.F.R. § 1508.27(b). NEPA regulations list ten factors that agencies should consider in evaluating the intensity of a proposed project's impacts.[2] *Id.* If an agency "concludes that the preparation

---

[2] The ten listed factors are:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

No. 22-30608

of an EIS is not required based on a FONSI, an aggrieved party may challenge the decision in federal court under the Administrative Procedures Act." *Sabine River*, 951 F.2d at 677 (citing 5 U.S.C. § 706(2)(A)).

One type of federal action requiring NEPA review is the issuance of permits under the CWA. Section 404 of the CWA authorizes the Corps to issue permits for the dredging or filling of navigable waters, such as wetlands. 33 U.S.C. § 1344(a). NEPA mandates that the Corps complete an EA and either prepare an EIS or issue a FONSI before granting a § 404 permit application. *See* 33 C.F.R. § 230.7(a). Section 404 also has its own requirements for analysis prior to issuing a permit, including examining the

---

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

*Spiller*, 352 F.3d at 242 n.3 (quoting 40 C.F.R. § 1508.27(b)).

No. 22-30608

cumulative impacts of the project on the aquatic environment and evaluating the relevant "public interest" factors. *See* 33 C.F.R. pt. 320.

## II. FACTUAL AND PROCEDURAL BACKGROUND

On February 6, 2018, Bruce Wainer of All State applied to the Corps for a wetlands permit under § 404 of the CWA. All State sought permission to begin work on the Timber Branch II project ("TB II"), a proposed multi-use commercial and residential development located in Covington, a town in St. Tammany Parish, Louisiana. The plans for TB II include a business campus, a public utility facility, a restaurant, and an 80-home development. Wainer owns the 200-acre tract within which TB II would be located.

TB II necessitated the Corps' permission because it involves the filling of jurisdictional wetlands. *See* 33 U.S.C. § 1344. The total acreage of TB II, as described in the application, is 69.19 forested acres. Wetlands comprise 24.58 of those acres. Those wetlands are adjacent to the (Little) Tchefuncte River and the Timber Branch River, and are in a flood hazard area. To develop the area, All State would need to fill the wetlands with concrete.

In 2000, the former owner of that tract applied for a § 404 permit for a project, also called Timber Branch II. The Corps granted that permit, allowing for the dredging and filling of 39.54 acres of wetlands. However, the district court enjoined that project, holding that the Corps abused its discretion in issuing the permit without any "real analysis or data." *O'Reilly v. U.S. Army Corps of Eng'rs*, No. Civ.A. 04-940, 2004 WL 1794531, at *5 (E.D. La. Aug. 10, 2004). This court upheld the district court's injunction, agreeing that the Corps had failed to adequately explain its permit issuance decision. *O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 234 (5th Cir. 2007). Specifically, we faulted the Corps for failing to explain how the noted environmental impacts of the project would be insignificant or would be

5

"reduced to insignificance by its prescribed mitigation measure." *Id.* at 232. The 2000 Timber Branch II project did not proceed after our decision.

We now return to the present permit. On March 19, 2018, the Corps posted a link on its website to a public notice of All State's permit application for TB II, in accordance with the CWA. No public meeting or hearing was requested to discuss the application, but the Corps received several comments on the proposal. The United States Environmental Protection Agency and the National Marine Fisheries Service submitted comments, stating that they had no objection to the issuance of a § 404 permit as long as the project satisfied the statute's requirements. The Tulane Environmental Law Clinic, on behalf of Hazel (Sinclair) Piazza, Loretto O'Reilly, and the Gulf Restoration Net-work, submitted a comment requesting denial of TB II as proposed. The Tulane Clinic expressed concerns about the high density of development in the area, the drainage and flooding, and the project's impacts on wetlands, wildlife, traffic, noise, and water quality. The Tulane Clinic further noted that TB II is substantially similar to the 2000 Timber Branch II project. Because, in that case, this court enjoined the Corps from issuing a § 404 permit "until further orders of the district court consistent with this opinion," the Tulane Clinic contended that the Corps could not grant All State's present application. Other comments detailed further concerns about the floodplain and storm drainage impacts of the project.

In November 2020, the Corps approved the permit application for TB II, issuing Permit MVN-2018-0215-EPP to All State. Alongside the permit, the Corps issued a 22-page Memorandum for Record ("MOR"), representing the EA in support of the Corps' issuance decision as required by NEPA.[3] The EA reviewed potential impacts of the project, evaluated

---

[3] The document is styled as a "Memorandum for Record," and the subject line is "Department of the Army Environmental Assessment and Statement of Findings for the

practicable alternatives, and described the compensatory mitigation required to offset any environmental effects. While the Corps did not itself respond to the public comments it had received, it provided All State's replies. The Corps issued a FONSI, explaining that "the incremental contribution of [TB II] to cumulative impacts . . . are not considered to be significant" and that compensatory mitigation would "help offset the impacts to eliminate or minimize the proposed activity's incremental contribution to cumulative effects."

Plaintiffs filed this case in the U.S. District Court for the Eastern District of Louisiana in May of 2021. Named as Defendants-Appellees were the Corps and the Corps' Chief of Engineers Lieutenant General Scott Spellmon, in his official capacity. Plaintiffs sought declaratory and injunctive relief under the Administrative Procedure Act ("APA"), NEPA, and the CWA.[4] Intervenor-Appellee All State and Intervenor Plaintiff-Appellee St. Tammany Parish Government ("St. Tammany") were granted permission to intervene. Plaintiffs, All State, and the Corps filed cross-motions for summary judgment. In August 2022, the district court granted summary judgment in favor of the Corps and All State, holding that the TP II MOR did

---

Above-Referenced Standard Individual Permit Application." The document "constitutes the Environmental Assessment, 404(b)(1) Guidelines Evaluation, as applicable, Public Interest Review, and Statement of Findings." Although it includes more than an EA—notably, the CWA's § 404 permit requirements as well as those under NEPA—we refer to the MOR as an EA for ease.

[4] Plaintiffs also disputed a permit that the Corps had granted for the Ochsner Extension Road project, which is a concrete fill project in wetlands less than two miles from the TB II area and in the same watershed. On appeal, Plaintiffs do not challenge the district court's decision to affirm the issuance of the Ochsner permit.

No. 22-30608

not violate NEPA or the CWA.[5] Plaintiffs filed a timely notice of appeal. Fed. R. App. P. 4(a)(1)(B).

## III. STANDARD OF REVIEW

This court reviews the district court's grant of summary judgment de novo, and applies the APA's standard of review to the agency's decision. *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 627 (5th Cir. 2001); *Medina Cnty. Env't Action Ass'n v. STB*, 602 F.3d 687, 699 (5th Cir. 2010). Under the APA, an agency action may be set aside only when it is determined to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A decision is arbitrary and capricious when the agency

> . . . has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Fath v. Tex. Dep't of Transp.*, 924 F.3d 132, 136 (5th Cir. 2018) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

"This is a demanding standard." *Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 697 (5th Cir. 2018). The district court is not permitted to conduct a de novo review of the permitting decision and ultimately substitute its own determination for that of agency's. *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 904 (5th Cir. 1983). As we recently reiterated, however, a reviewing court "must ensure that the agency

---

[5] The district court also held that the Corps' issuance of the TB II Permit did not violate the Fifth Circuit's 2007 injunction in the previous *O'Reilly* litigation. On appeal, Plaintiffs do not challenge that decision, but instead contend that the earlier *O'Reilly* case is informative, but not binding, in the instant matter.

has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, 45 F.4th 846, 855–56 (5th Cir. 2022) (internal quotation marks and citation omitted). The agency must examine the relevant data and articulate a satisfactory explanation for its action, including a "rational connection between the facts found and the choice made." *Atchafalaya Basinkeeper*, 894 F.3d at 697 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

## IV. ANALYSIS

On appeal, Plaintiffs assert that the district court erred in upholding the Corps' decision. They contend that the EA failed to meaningfully consider the potential impacts of TB II, including its cumulative effects, in violation of both NEPA and the CWA.

### A. Potential Direct and Indirect Impacts

The Corps issued a FONSI because it determined that TB II would not have a significant impact on the environment. The EA includes tables that summarize the Corps' analysis of: (1) potential impacts on physical and chemical characteristics in the aquatic ecosystem; (2) potential impacts on biological characteristics in the aquatic ecosystem; (3) potential impacts on special aquatic sites; (4) potential impacts on human use characteristics; and (5) factual determinations of potential impacts. Each of those tables are drawn from the regulations associated with § 404 of the CWA. *See* 40 C.F.R. pt. 230. In those tables, the EA indicates whether TB II would have "no effect," a "negligible effect," a "minor effect (short term)," a "minor effect (long term)," or a "major effect" on the area. For example, in evaluating the project's potential impact on the biological characteristics of the aquatic ecosystem, per 40 C.F.R. § 230.30, the Corps determined that the project would have no impact on threatened and endangered species, a short-term

minor impact on aquatic organisms, and a long-term minor impact on other wildlife. In another example, the Corps checked off "minor effect (long term)" for TB II's impact on wetlands. In a one-sentence "discussion" following that particular table, the EA states that "compensatory mitigation should minimize negative impacts to wetland resources."

Consistent with its responsibility under the CWA, the EA also includes a Public Interest Review. The Corps again used a table to evaluate the effects of TB II, running from "detrimental" to "beneficial," on twenty-one factors. Those factors cover a variety of considerations, including conservation, flood hazards, floodplain values, safety, and energy needs. The Corps concluded that the project would have a "neutral (mitigated)" impact on wetlands, a "negligible" impact on flood hazards, and a "detrimental" impact on recreation. The only discussion in that section states: "[t]opics noted as detrimental in Table 9 [the Public Interest Review] will be short-term and localized."[6]

Plaintiffs challenged the EA's conclusions on the significance of those impacts, asserting that the Corps acted arbitrarily by "X-ing off" significance determinations without explanation. The district court disagreed. It noted that the Corps relied on a hydrological analysis submitted by All State in assessing the significance of the project's impacts, and chose not to credit the opposing study offered by Plaintiffs from Dr. Tonja Koob. The district court also emphasized that the ten intensity factors in the CEQ regulations are not "categorical rules" that must be addressed separately and directly. The court thus held that the Corps did not act arbitrarily by not making express

---

[6] Interestingly, the next page of the EA states that the "detrimental effects that the proposed work is likely to have on the public and private use" are "minimal and *permanent*." (Emphasis added).

significance findings for each factor in determining whether TB II's potential impacts were severe enough to warrant a full EIS.

We have repeatedly agreed that "mere perfunctory or conclusory language will not be deemed to constitute an adequate record and cannot serve to support the agency's decision not to prepare an EIS." *O'Reilly*, 477 F.3d at 231 (quoting *Citizen Advocates for Responsible Expansion, Inc. (I-Care) v. Dole*, 770 F.2d 423, 434 (5th Cir. 1985)). An EA is intended to be a "rough-cut, low-budget preliminary look at the environmental impact of a proposed project," but the Corps' decision must still be reasonably supported. *Sabine River*, 951 F.2d at 677 (internal citation omitted). This court must ensure that the agency has "reasonably considered the relevant issues and *reasonably explained the decision*." *Fed. Commc'n Comm'n v. Prometheus Radio Proj.*, 592 U.S. 1152, 1158 (2021) (emphasis added).

The Corps articulated no basis for its findings of significance. It failed to explain, for example, why it determined that TB II would have a short-term minor effect on aquatic organisms but a long-term minor effect on other wildlife. That failure to make a "rational connection between the facts found and the choice made" is a dereliction of the duty imposed by NEPA. *Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43 (internal citation omitted). Although an EA is intended to be short, it still must explain its reasoning. *See id.* The deficient EA in the 2003 *O'Reilly* litigation was nearly twice the length of this one, and included a paragraph about the significance of each physical impact. Even that was insufficient under NEPA. *O'Reilly*, 477 F.3d at 232. Here, the use of checkboxes without any comment or analysis is even less thorough and does not meet the level of scrutiny required by NEPA.[7]

---

[7] We do recognize that the EA is not entirely devoid of reasoning. In the table on factual determinations, for example, the Corps checked off "minor effect (long term)" for the project's impact on aquatic ecosystem and organisms. In the five-sentence

The district court reasoned that the Corps came to its determination of significance by crediting All State's expert's analysis, which found that the project will "actually decrease floodwater runoff," instead of that of Dr. Koob, which opined that the opposite would occur. This is an impermissible post-hoc rationalization, not supported by the EA, which nowhere mentions either study. *See Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 50. Further, the Corps is not permitted to "reflexively rubber stamp a statement prepared by others." *Save Our Wetlands, Inc. v. Sands*, 711 F.2d 634, 642 (5th Cir. 1983). Nothing in the record suggests that the Corps either performed the required independent evaluation of the applicant-submitted hydrologic study or conducted its own research. *See* 40 C.F.R. § 1506.5(a) ("The agency shall independently evaluate the information submitted and shall be responsible for its accuracy."). Similarly, the EA does not provide any response to public comments; it includes only All State's answers.[8] The Corps was essentially silent as to why it agreed with All State and decided to issue a FONSI.

By failing to explain *how* it determined TB II's impacts would not rise to the level of significant, the Corps "entirely failed to consider an important aspect of the problem." *Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43. The Corps

---

"discussion" after the table, it noted that "[a]quatic organisms are typically motile and would attempt to avoid the work areas." That helps to explain *why* TB II's effect on aquatic organisms would not be major. On remand, the Corps must support its other findings with similar explanations.

[8] Agencies are not required to respond to each comment individually, but the regulations contemplate some type of agency response. *See* 40 C.F.R. § 1503.4; *see also Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 185 (4th Cir. 2005) (interpreting § 1503.4 to mandate agency response); *Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 537 (8th Cir. 2003) (same); *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1177 (10th Cir. 2003) (same). The EA as written prevents us from discerning whether the Corps assessed and approved of All State's responses to the comments or simply "rubber stamp[ed]" them. *Save Our Wetlands*, 711 F.2d at 642.

thus acted arbitrarily in relying on this EA to issue a FONSI. *See O'Reilly*, 477 F.3d at 234.

### B. Cumulative Impacts

An action may individually affect the environment, directly or indirectly, or many small actions may accumulate to make a larger impact. Plaintiffs challenge the district court's determination that the Corps' FONSI was not arbitrary and capricious for its failure to analyze not only TB II's individual impacts, but also the project's cumulative effect on the environment. We begin with a review of the statutory framework under NEPA and the CWA, as both statutes require an analysis of the cumulative impacts of an agency action.

NEPA defines cumulative impact as one that "results from the incremental impact of the action when added to other past, present, and reasonably foreseeable actions." 40 C.F.R. § 1508.7. Cumulative impacts "can result from individually minor but collectively significant actions taking place over a period of time." *Id.* The statute requires an agency to consider cumulative impacts when assessing the severity of a proposed project's environmental effects, as well as the scope of the action's impact. 40 C.F.R. §§ 1508.25(a)(2), 1508.27(b)(7).

The CWA itself also requires consideration of cumulative effects when making factual determinations about the impacts of the proposed discharge of fill material on the aquatic environment. 40 C.F.R. § 230.11(g). The Act defines cumulative impacts as environmental changes that "are attributable to the collective effect of a number of individual discharges." *Id.* It notes that "[a]lthough the impact of a particular discharge may constitute a minor change in itself, the cumulative effect of numerous such piecemeal changes can result in a major impairment of the water resources and interfere with the productivity and water quality of existing aquatic ecosystems." *Id.*

The TB II EA mentions cumulative impacts of the project in several areas. First, within the table on "factual determinations," as required by the CWA, the Corps found that the project will have a long-term minor impact on the "cumulative effects on the aquatic ecosystem." Section 9 of the EA, citing regulations from both the CWA and NEPA, purports to discuss "the overall impacts that will result from [TB II], in relation to the overall impacts from past, present, and reasonably foreseeable cumulative impacts in the area." The Corps defined the geographic and temporal scope for the cumulative effects assessment, described the location of the project site, and determined that "the incremental contribution of the proposed activity to cumulative impacts on the area . . . are not considered to be significant." The district court held that this discussion was sufficient under the APA.

Although not mentioned in the district court's decision on this point, the parties' current disagreement about cumulative impact analysis centers on our decision in *Atchafalaya Basinkeeper*. There, we held that "a finding of no incremental impact relieves an agency of the necessity of extensive and ultimately uninformative discussion of cumulative effects pursuant to [NEPA]." 894 F.3d at 704. This makes logical sense: as All State points out, seven plus zero is still seven. When a project will not have any incremental effect on the environment, it cannot contribute to a wider cumulative effect. This is premised on the "rule of reason," which "relieves agencies from preparing exhaustive reports that would serve no purpose in light of NEPA's regulatory scheme as a whole." *Fath*, 924 F.3d at 139 (internal quotation marks and citation omitted).

Appellees maintain that the Corps was relieved of its responsibility to conduct a cumulative impact analysis because the EA showed that TB II would not have any significant effects on the environment. Putting aside our earlier discussion of the arbitrary nature of the Corps' individual significance determination, Appellees confuse incremental impact and significant impact.

NEPA requires consideration of cumulative impacts so as not to discount the effect of the "*incremental* impact[] of the action when added to other[s]." 40 C.F.R. § 1508.7 (emphasis added). The EA determined that TB II would result in some level of habitat loss, and in an increase in traffic and noise, among other effects. Although such impacts were not anticipated to rise to the level of significant, they are at least incremental, as they do exist. This case is therefore distinguishable from *Atchafalaya Basin*, in which the EA found no incremental impact at all. 894 F.3d at 703.

TB II is the very type of project that cumulative impact analysis is intended to address. Without that important step, projects like TB II, which result in a number of incremental impacts on the environment, could pile up and lead to something significant, while escaping the eye of the Corps.[9] The Corps has fielded over eighty § 404 permit applications in the last five years in an area within three miles of the TB II site. If each of those projects has only an incremental environmental impact of 0.1 (an arbitrary small number that represents the incremental anticipated impact of TB II), the Corps' reasoning here would relieve it from its responsibility to conduct a cumulative assessment. However, such analysis would be valuable since it

_____

[9] While we used the words "incremental" and "significant" somewhat interchangeably and perhaps imprecisely in our decision in *Fath*, in that case our policy concerns were different. There, the proposed project involved overpasses in an already highly-developed and highly-trafficked urban area. 924 F.3d at 139. This court determined that engaging in a full cumulative assessment would "serve no purpose," as the proposed action would not "change the environmental status quo" of an already urban site. *Id.* at 139-40. That is not the case here, as All State is proposing to permanently fill 24.58 acres of wetlands and develop what is still a natural environmental area. This case is more like *Fritiofson v. Alexander*, in which we explained that the "unique and fragile nature of wetland areas" means that incremental impacts are more likely to compound into a cumulatively significant effect. 772 F.2d 1225, 1246 (5th Cir. 1985), *abrogated on other grounds by Sabine River*, 951 F.2d 669. The "rule of reason" does not support a decision to forego cumulative analysis here. *Fath*, 924 F.3d at 139.

would reveal that, cumulatively, the projects have a significant effect on the environment. While seven plus zero is still seven, seven plus eight (0.1 times 80) is fifteen.

The district court's holding that the Corps did not need to conduct a cumulative impact analysis was premised on a different line of reasoning, *viz.*, that cumulative impact is one of ten "non-categorical factors" in the regulations. While this may be true in the list of intensity factors in 40 C.F.R. § 1508.27, that is not the only regulation requiring cumulative analysis under NEPA. The regulations also mandate consideration of cumulative impact when addressing *types* and the *scope* of effects. *See* 40 C.F.R. §§ 1508.7, 1508.25(a)(2). And we have said that "agencies *must* consider each cumulative impact of permitted actions." *Atchafalaya Basinkeeper*, 894 F.3d at 703 (emphasis added) (internal quotation marks omitted). Unless the project will have no incremental environmental impacts whatsoever, as discussed above, some amount of cumulative analysis is required.

Because the EA determined that TB II would have some level of incremental impact on the environment, it was arbitrary and capricious for the Corps to limit its cumulative impact analysis. *See Fath*, 924 F.3d at 140. And the limited analysis that is included in the EA does not meet the requirements of NEPA. A cumulative effects assessment must include consideration of "past, present, and reasonably foreseeable future actions" that have had or are expected to have impacts in the same geographic area. 40 C.F.R. § 1508.7. The EA does not mention any of those other actions. *See* While the Corps is entitled to consider the effects of past actions "in the aggregate" without mentioning specific individual past projects, the Corps failed to do even that. *See* James L. Connaughton, *Guidance on the Consideration of Past Actions in Cumulative Effects Analysis* (Mem.), COUNCIL ON ENV'T QUALITY (June 24, 2005), https://ceq.doe.gov/docs/ceq-regulations-and-guidance/regs/Guidance_on_CE.pdf. The EA nowhere

refers to two past phenomena that constitute important context for the TB II proposal: (1) the dozens of permits that the Corps has granted recently in the Liberty Bayou-Tchefuncta area, and (2) the catastrophic 2016 flooding in St. Tammany, both of which were raised by several public comments. The Corps failed to consider how the incremental effects of the project might compound these preexisting environmental concerns. Or, if it did, it did not adequately document its analysis so that we could meaningfully review its decision. *See Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43.

On the other hand, we are not persuaded that, as Plaintiffs argue, the Corps acted arbitrarily or abused its discretion by failing to consider reasonably foreseeable future actions in its cumulative assessment. A reasonably foreseeable action is one that is "sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision." *City of Shoreacres v. Waterworth*, 420 F.3d 440, 453 (5th Cir. 2005) (citation omitted). Plaintiffs contend that the record shows that it is reasonably foreseeable that the TB II project will be expanded to cover the rest of Bruce Wainer's land. In support of this contention, Plaintiffs offer two affidavits from residents who represent that Wainer showed them his plans to develop the rest of the site. Such evidence is not enough to establish that future development is "sufficiently likely," rather than merely a possibility. *City of Shoreacres*, 420 F.3d at 453. Indeed, this court has found that future development need not be considered in cumulative impact analyses when permit applications have been filed but the Corps has not yet begun working on an EIS, since the plans could still be "cancelled or drastically altered." *Gulf Restoration Network v. U.S. Dep't of Transp.*, 452 F.3d 362, 370 (5th Cir. 2006). Wainer's alleged plans are far less established. The Corps did not abuse its discretion in failing to specifically address those future actions.

A brief word is in order regarding the CWA, as Plaintiffs challenge the Corps' permitting decision under both NEPA and the CWA. We have

determined that the Corps acted arbitrarily when it issued a FONSI without conducting a sufficient analysis in the EA of TB II's cumulative impacts – all in violation of NEPA. As described above, the CWA has its own cumulative assessment requirements beyond and apart from NEPA, focused on the aquatic environment. The district court declined to consider the cumulative effects of TB II under the CWA because it was "not persuaded that the specific cumulative impacts concerns raised by Plaintiffs actually implicate the CWA's zone of interests." We disagree. The CWA requires the Corps to consider the "changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual discharges of dredged or fill material." 40 C.F.R. § 230.11(g)(1). Plaintiffs raised concerns about the cumulative impact of the large number of § 404 permits issued in the area by the Corps in recent years. That, in turn, permitted activity which has led to a higher number of dredging or filling projects, rendering it directly related to the CWA's "zone of interests."[10]

Under the APA, the Corps must adequately explain its decision making, regardless of the statute under which its action is challenged. *See Ohio Valley Env't Coalition v. Aracoma Coal Co.*, 556 F.3d 177, 209 (4th Cir. 2009) (reviewing cumulative analysis under both the CWA and NEPA). Just as the analysis of potential impacts of TB II was deficient under NEPA, so too are the considerations of the impacts on the aquatic ecosystem under the CWA. The Corps must explain *why* it concluded that "[c]umulatively, similar projects could have a long-term impact on the aquatic ecosystem." Without this "rational connection between the facts found and the choice

---

[10] Assuming the district court was referring to Plaintiffs' central focus on flooding, changes in the floodplain would certainly impact the area's aquatic environment. And Plaintiffs did in fact raise specific concerns about the impact of the project on water quality and the habitat of aquatic wildlife.

made," this court cannot perform its duty in ensuring that the Corps' decision was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 41, 43 (quoting 5 U.S.C. § 706(2)(A)).

## V. CONCLUSION

We understand that an EA is intended to be a concise document. 40 C.F.R. § 1508.9(a). Yet it must also "provide sufficient evidence and analysis" for determining whether to prepare an EIS or issue a FONSI. *Id.* Because the TB II EA lacks sufficient detail, we cannot say whether or not the project will have a significant effect on the environment—it remains "an open question." *Fritiofson*, 772 F.2d at 1247 (quoting *La. Wildlife Fed., Inc. v. York*, 761 F.2d 1044, 1053 (5th Cir. 1985)). We remand this case to the Corps to reassess the significance of the instant project in light of this Court's opinion.

We therefore (1) REVERSE and VACATE the district court's Order of August 15, 2022; (2) ENJOIN the Corps from issuing a § 404 permit until the district court issues further orders; and (3) REMAND this case to the Corps for further proceedings consistent with this opinion, including the preparation of a new EA.